Wright v. Miller.

SAME TERM. *Before the same Justices.*

WRIGHT and others *vs.* MILLER and others.

H. R., by a deed executed by her previous to her marriage, and in contemplation thereof, conveyed her real estate to R. C., in trust, with the consent of the grantor in her lifetime, or after her death, to sell so much of the said property as might be necessary to pay every expense incurred for the education, clothing and support of the said H. R., or for partition, improving, altering, or amending her said estate, or for fulfilling the purposes thereby intended, or to lease or demise the same in such manner as the trustee should think proper, and from the proceeds of such sales and leases, first to pay all expenses of repairs and improvements of the property, and then to pay for the reasonable support and maintenance of H. R.; second, to put out the residue at interest on landed security, for the use of the said H. R. and her heirs; third, after the death of H. R. to pay and apply the residue of said moneys occasionally for and towards the maintenance of her children, if any, as they might require during their life; and fourth, if H. R. should die without children, to pay all the residue to and for the use of the children of S. E. R., with a further limitation over. *Held* that the absolute power of disposal reserved to H. R. the *cestui que trust*, for her own benefit, conferred upon her the equitable fee simple in the estate, absolute and unqualified, and rendered the intended limitation over for the benefit of her children, qualified as it was, null and void. And that the children of H. R. had no right to file a bill, *during their mother's lifetime*, to set aside conveyances, and decrees, affecting the trust estate.

A decree against infants, setting aside a conveyance made in trust for them,

Wright *v.* Miller.

which decree contains no provision allowing them a day to show cause after they shall become of age, is erroneous, and is not conclusive upon them. And if the infants have any valid interest in the trust property, they are entitled to relief in a court of equity.

IN EQUITY. This was an appeal by E. W. Miller, from a decree of the former assistant vice chancellor of the first circuit. The case, before the assistant vice chancellor, is reported in 1 Sandford's Chancery Reports, 103. The facts appearing, from the pleadings and testimony, and the points raised and decided in the court below, are there fully stated ; except that the trust deed executed by Hannah Ryerson to Campbell, previous to her marriage, is not particularly set forth. As the decision of this court, upon the appeal, turned upon the construction and effect of that deed, it is necessary to state the substance of it. By that deed, Hannah Ryerson conveyed her real estate to Robert Campbell *in trust*, with the consent of the said Hannah in her lifetime, or after her death, to sell so much of the said property as might be necessary to pay every expense incurred for the education, clothing and support of the said Hannah, or for partition, improving, altering, or amending her said estate, or for fulfilling the purposes thereby intended, or to lease or demise the same in such manner as said trustee should think proper, and from the proceeds of such sales and leases, first to pay all expenses of repairs and improvement of the property, and then to pay for the reasonable support and maintenance of said Hannah. Second, to put out the residue at interest on landed security for the use of said Hannah and her heirs. Third, after the death of said Hannah to pay and apply the residue of said moneys occasionally for and towards the maintenance of her children, if any, as they might require during their life. And fourth, if said Hannah should die without children, to pay all said residue to and for the use of the children of Samuel Ellis Ryerson, if any ; and if none, to his (Campbell's) own use forever.

*B. W. Bonney & C. O'Conor*, for the appellant. I. By the intention and effect of the deed to Campbell, Hannah Ryerson

Wright *v.* Miller.

reserved to herself by the aid of the trustee, the entire domin-
ion over her property; with a provision that whatever might
remain at her death unappropriated by her, should go to her
descendants, if any, and if she should leave none her surviving,
then over. Such settlements are common; when prepared by
skilful conveyancers, they contain formal limitations, with a
formal power of revocation in the principal beneficiary. (*Bland*
v. *Bland*, 2 *Cox*, 351. *Brudenell* v. *Elwes*, 7 *Ves*. 381. 1
*Spence's Eq. Juris.* 486. *Crabb on Real Property*, § 2065.
*Merrifield's Watk. on Conv.* 345, 369. *Lewis on Perp.* 583,
*notes.*) The *limitations* are so framed as to attain this result,
though in an inartificial manner. A power is often implied.
(*Inchiquin* v. *Burnell*, 3 *Ridg. P. C.* 420.) This was an
active trust in Campbell, not executed by the statute of uses;
it gave the whole *legal* estate to him, and vested in each of
the beneficiaries named in the declaration of trust an *equitable*
estate, in extent and duration equal to the benefit intended.
That it is not executed, see *Jickling on Eq. Estates*, 32;
*Crabb on Real Prop.* §§ 1706, 1707; *Merrifield's Watk. on
Conv.* 309. That the beneficiaries took equitable estates, see
*Jickling on Eq. Est.* 28, 32. The rules of decision which
govern *legal estates*, in relation to their transmission to heirs
or next of kin, and by conveyance *inter vivos*, are applied by
analogy, to *equitable* estates. (*Jickling*, *p.* 17, *and see Ap-
pendix.* *Burton*, § 1383. *Crabb*, §§ 1394, 1395, 1941. *Mer-
rifield's Watk.* 306, 318, 321. 1 *Spence's Eq. Juris.* 501, 502.)
They may be granted or alienated by the same forms of con-
veyance, which would pass them if they were *legal* estates.
(*Jickling*, 32. *Burton*, § 1368. *Crabb*, § 1720. *Sanders on
Uses and Trusts*, 265. 2 *Cas. in Ch.* 78. 1 *Bro. C. C.* 72.)
For instance, equity requires a common law recovery before it
will pass an equitable estate tail and bar the equitable remain-
ders. (*Jickling*, 126, 337, 340. *Burton*, § 1369. 1 *Spence's
Eq. Jur.* 500. *Sanders*, 265. *Watkins*, 286, 318.) And this,
notwithstanding that such recovery was absolutely void at law.
(*Burton*, § 1369, *note.*) The rule in Shelly's case applies to
limitations of equitable estates. (*Lewin on Trusts*, 48. *Bur-*

*ton,* § 1383. *Jickling,* 286, 287.) Whenever property is conveyed in trust, by will or deed, if all or any of the trusts fail, from illegality or otherwise; and where there is an omission to declare trusts as to all or any part of the property, a trust *results* in favor of the settler, in whole or in part, as the case may be. (*Jickling, p.* 40. *Lewin,* 169. *Watkins,* 299, 313, 314. *Burton,* § 1453. *Crabb,* §§ 1551, 1771 *to* 1778, 1780, 1787.) The rules in restraint of perpetuities apply to trusts. (*Lewis on Perpetuities,* 138, 139, 588, 589. *Randel on Perpetuities,* 95.) The title of Campbell may therefore be left out of view; and the inquiry confined to the construction of the declarations of trust. Strict rules of construction obtain in respect to limitations in common law conveyances, and also in conveyances taking effect under the statute of uses; for the latter have become *legal* estates. (*Crabb,* §§ 1664, 1665. 1 *Spence's Eq. Jur.* 480, 481, 489.) But *declarations of trust* which merely confer equitable titles, are construed in the same liberal spirit as wills, although they happen to be contained in *deeds.* (*Preston's ed. of Shep. Touch.* 106. *Watkins,* 311, 318. *Lewin,* 26, 44. *Burton,* § 1370. *Crabb,* § 1764.) The vice chancellor erred in supposing that there was any direction for accumulation; or that there was any remainder of either capital or accumulations to the unborn issue or possible heirs of the unborn children of Mrs. Miller. The supposed interests limited to the heirs or children of unborn issue, if attempted to be created, would have been void. The time in reference to the rule against perpetuities is to be computed from the execution of the deed. (1 *Spence's Eq. Jur.* 487. *Lewis on Perpetuities,* 488, *subd.* 3.) At the execution of the deed, Mrs. Miller had no child. Therefore the supposed ulterior limitation was to persons who could not be ascertained until a future generation should be *born* and should *die.* (*Archer's case,* 1 *Coke,* 67, *Resolu.* 1 *and* 2. *Bayley* v. *Morris,* 4 *Ves.* 795. 2 *Ventris,* 313.) The supposed limitation would therefore have been void as to the *corpus.* (*Note* 1 *to* 1 *Jarman's Pow. on Dev.* 389. *Cadell* v. *Palmer,* 1 *Cl. & Fin.* 372. *Lewis on Perp.* 458, *subd.* 5, *p.* 464, 161.) And also as to the suppo-

sed accumulation: and *in toto.* (*Lewis on Perp.* 592. *Randel on Perp.* 225. *Lewin*, 138. *Burton*, § 1450. *Crabb*, §§ 1715, 1716.) Upon the vice chancellor's construction of the trust the only valid interest which could exist in the children, is for a sustenance from their mother's death to their own. This gave no right to file any bill except a bill *quia timet.* (*Wright* v. *Atkyns*, 1 *T. & Russ.* 143.) The details of the trust show that Mrs. Miller intended to preserve the virtual ownership, and actual dominion over the whole property. Her disclaimer of ability to manage, is qualified, "*except by a trustee.*" During her life, her trustee is not to sell except by her consent. She is to be the *sole judge* of her scale of expenditure. She does not confine her expenditure to the income. The principal is also devoted to her use. The direction is not to *apply* to her support, but to *pay* over to her. She may demand the *whole;* especially as there is an equitable conversion of the whole into money. (*Leigh & Dalzell on Eq. Conversion*, 51, 57. *Kane* v. *Gott*, 24 *Wend. p.* 569.) She doubts if "*the residue*" will embrace any thing. "Residue" and what may remain, are synonymous. (11 *Ves.* 331. 2 *Atk.* 170.) The allusions to the settlor's *support and maintenance* being an object of the settlement, have no restraining effect. The *motive* or *reason* for a gift, does not lessen the interest of the donee. A *fortiori* of a settlor to her own use. (*Benson* v. *Whittam*, 5 *Sim.* 22. *Cole* v. *Wade*, 16 *Ves.* 44.) A recital will not control the subsequent limitations. To a common intent, "support and maintenance" imply every expenditure that can arise in life to gratify any human desire. (*Burr* v. *Burr*, 7 *Hill*, 209, 222, 230.) The phrase is of very common occurrence, and is mere verbiage. "Reasonable," "permanent" and "suitable," are all phrases of the same character. (*Brydges* v. *Brydges*, 3 *Vesey*, 120. *Hammond* v. *Neame*, 1 *Swanst.* 36. *Rawson* v. *Samuel*, 9 *Simons*, 438. *Hamley* v. *Gilbert, Jac. R.* 354. *Mogg* v. *Mogg*, 1 *Meriv.* 657, 705. *Silvester* v. *Wilson*, 2 *T. R.* 444. 11 *Ves.* 205.) Where no special interest or title is limited to a party who has a full power of disposition and control, a power to spend or waste the

whole, such party takes the absolute property; and all remainders of what may chance to be left, are nugatory and void. (1 *Sandford's Ch. Rep.* 275. *Ross* v. *Ross,* 1 *Jac. & Walk.* 153. *Att'y Gen.* v. *Hall, Id.* 158, *note. Cuthbert* v. *Purrier,* 1 *Jacob,* 415. 1 *Ambler,* 750. 2 *Vernon,* 181. 1 *Watts,* 390. *Beachcroft* v. *Broom,* 4 *T. R.* 441. *Flanders* v. *Clark,* 1 *Ves. sen.* 9. *Bull* v. *Kingston,* 1 *Meriv.* 319. *Bradley* v. *Peixotto,* 3 *Ves.* 324.) Held also in a class of cases where a recommendatory form was assumed to be imperative, as it often is. (2 *Ves. jun.* 532. 2 *Blunt's Amb.* 686. 3 *Ves. jun.* 7. 5 *Madd.* 117. 2 *Eq. C. Abr.* 291. 19 *Ves.* 662. 11 *Id.* 205. 2 *Cox,* 351. 2 *Mylne & Keene,* 197. 10 *Simons,* 6.) II. If there are any limitations beyond a mere tenancy of the fund at the will of Mrs. Miller, then she was tenant in tail. The greatest incongruities result from narrowing the word children, so as to make them take as *purchasers.* It must go over, even if there are grandchildren, if the children should predecease their mother. (*Adams* v. *Adams, Cowp.* 656. *Brudenell* v. *Elwes,* 7 *Ves.* 381. 1 *East,* 455.) If they take at all, they can only take an estate for life. *Expressum facit cessare tacitum.* (*White* v. *Collins,* 1 *Com. Rep.* 298, 301.) It is impracticable to give effect to any supposable intent, except by construing child or children as *nomen collectivum*—taking in all descendants; and then it gives an estate tail to Mrs. Miller, the first taker. (*King* v. *Burchell,* 4 *T. R.* 298, *note. Doe* v. *Geering, Cowper,* 412. *Alposs* v. *Watkins,* 8 *T. R.* 516. *Frank* v. *Stovins,* 3 *East,* 548. *Wharton* v. *Gresham,* 2 *W. Bl.* 1083. *Hodges* v. *Middleton,* 2 *Doug.* 431. *Jesson* v. *Wright,* 2 *Bligh's P. C.* p. 1. *Franklin* v. *Lay, cited in note to same, p.* 59. 2 *Jarman's Powell on Devises,* 23, 24.) The limitation over being only in case issue failed *at her death,* is no impediment to the construction of a fee tail in her. There is no difficulty in construing an estate tail from words which give it, though there should be *no* remainder given over. It is only when an estate is to be *implied* in the first taker, merely from the structure of the *remainder* itself, that these words are important. (*Doe* v. *Goldsmith,* 7 *Taunton,* 20.) There may

be a limitation by way of executory devise in a will, or spring-ing use in a deed, limited to take effect not upon the natural termination of the estate tail, as required in common law re-mainders, but upon some collateral circumstance abridging the first estate. If Mrs. Miller took an estate tail, it would give her immediately an absolute interest in the property; whether it is to be regarded as realty or personalty. (*Peterson* v. *Ellis*, 11 *Wend.* 259.) III. The imputations of fraud in the chancery proceedings are founded upon mistake. Equi-table estates tail were conveyed in England, by means of a common recovery to a purchaser, who then filed a bill in equi-ty, and compelled the trustee to convey the legal estate to him. (*Philips* v. *Bridges*, 3 *Ves.* 126, *cited in* 18 *Ves.* 418. *Crabb*, §§ 1857, 1861, 1890. 1 *Spencer's Eq. Jur.* 506.) It has been thought that a decree in equity was the more apt procedure for this purpose. It might well be resorted to here, since estates tail were abolished. (*Jickling*, 125, *note x.*) At the time Messrs Harison and Munro advised the proceedings in chancery, it was conceived that a voluntary grantor had, in effect, the power of revocation, as of course. That a purchaser for value could vacate the deed, even though he had notice, was the re-ceived law. (4 *Kent's Com. p.* 463, *note d.* *Cathcart* v. *Rob-inson*, 5 *Peters*, 279.) Whether a proceeding to cut off poster-ity by legal fictions, was necessarily a fraud, was a doubt 300 years ago, but it has not been so at any time since. (*Doctor and Student, ch.* 26, *p.* 69.)

*J. A. Lott*, for the respondents. I. The trust deed of 12th September, 1809, from Hannah Ryerson to Robert Campbell, cannot be questioned by the defendant Ezra W. Miller. It was not executed in fraud of his marriage rights. But if it were otherwise, his long acquiescence in its provisions precludes him now from questioning its validity. It is not impeached by the pleadings. II. Under that deed the complainants, Elizabeth Ann Wright and Charles E. Miller, acquired a beneficial inter-est in the trust property, sufficient to authorize a bill for relief to be filed, upon the facts and circumstances set forth. III. The

Wright *v.* Miller.

proceedings in chancery by Westervelt and DeGarmo, and the decrees made thereon, even if *bona fide*, are not binding on the complainants, Elizabeth Ann Miller and Charles E. Miller, who were then infants, although they were made parties thereto. The omission to insert in the decrees a day for them to show cause after they become of age, was erroneous. IV. This error can be examined into on an original bill. V. Those proceedings and decrees were in fact collusive and fraudulent. And the jurisdiction of the court to set aside those decrees, thus obtained, is unquestionable. VI. The defendant, Ezra W. Miller, being the plotter and manager of the frauds practised under the forms of law on his infant children, cannot claim the rights and protection of a *bona fide* purchaser. VII. The decree of the assistant vice chancellor was equitable and correct, and ought to be affirmed with costs.

*By the Court*, Strong, P. J.　The bill states that Hannah Ryerson executed the trust deed to Robert Campbell, in contemplation of her marriage with the defendant, Ezra W. Miller. This is not denied, nor in any manner put in issue, by the answer. So far as relates to the claims of the plaintiffs in this suit, that fact is admitted, and so long as the pleadings remain in their present state, cannot be controverted by them. Miller says in his further answer that he knew nothing of the making or existence of the deed at the time when it was executed, nor until after his marriage. This averment having been called for by the exceptions taken to the first answer, and being verified according to the requisition of the bill by his oath, is evidence in his favor, and must prevail, unless satisfactorily rebutted by the testimony adduced in the case. It is proved that the existence of the deed, and the management and control of the estate by Campbell, were known to many others in the neighborhood where Hannah Ryerson resided, and that Miller asked the permission of the trustee to pay his addresses to her. This is all the evidence to show Miller's knowledge of the deed, before his marriage, and it is not, in my opinion, sufficient for that purpose. What others knew was not even competent

evidence against him, and if admissible, would raise but a slight inference that he was acquainted with the same facts. The trustee had been her guardian, from the death of her father, and the application to him would seem to evince an impression on the part of Miller that she was still a minor and in some degree under the control of her guardian, and not that she had attained her full age, and had the legal capacity to execute a deed. The weight of evidence is that Miller knew nothing about the deed at the time of his marriage. If, as the bill states, the deed was executed in contemplation of the marriage, and as the answer proves he knew nothing about it until after the marriage had been consummated, it was in fraud of his marital rights, and he could have avoided it had he chosen to do so. But it was valid or void at his election. He did not choose to make any attempt to set it aside, but on the contrary his subsequent conduct evinced an acquiescence by him in the validity of the instrument, and he makes no resistance to its original efficacy, in his answer : consequently he cannot avail himself of the objection now. The only bearing which those facts can have in this controversy is upon the question of actual fraud in Miller. If he had been deceived as to Mrs. Miller's possession and control of her property, and his rights had been wrongfully invaded, he might have very honestly assented to, and even proposed, the practical revocation of the trust, and the transfer of the property to him. Particularly if he contemplated at the time, as I think he did, to make a suitable provision for his wife out of the property, and to make some eventual provision for her children. It does not appear that the plan to change the title of the property from the trustee to Miller originated with him. Campbell the trustee testified that he first talked about getting rid of the trust, and that it was probable the proposition first came from him. Miller of course readily assented to it. They consulted with Mr. Richard Harison, (who was counsel for the trustee,) and Mr. Peter J. Munro, as to the best method to accomplish their object. They also consulted the executors of the will under which Mrs. Miller derived her title to the property, This was before taking any steps to

effectuate a change of the title.   It is evident that neither the deed to Westervelt nor DeGarmo had then been executed. Campbell swears that the sales to them resulted from a plan adopted by counsel for getting a decree in chancery.   And yet the vice chancellor supposes that the able and honorable counsel who conducted the whole transaction, knew nothing originally about the object or consideration of those deeds.   I have looked in vain over the evidence to find any thing to warrant the supposition.   Miller, whose *bona fides* in the transaction was assailed by the bill, swears that the deeds to Westervelt and DeGarmo were made under the advice of Mr. Harrison and Mr. Munro, with the intent to release the premises thereby conveyed from the effect and operation of the trust deed, and that they advised him that it might be fairly and honestly done.   So far as it relates to Mrs. Miller, it does not appear that she made the slightest opposition to the arrangement, nor that she acted under the duress or undue influence of her husband.   It no where appears that she was ordinarily at all under his control, but unfortunately there is every reason to infer quite the contrary.   Neither did she, until after the institution of this suit, make any attempt to set aside the deeds, or the consequent transfer of the property to Miller, although she had been divorced from him for many years.   There can be no doubt but that she was induced to execute and acknowledge the deeds by an understanding at least that the annuity of $600 was to be secured to her during life, and a belief that the whole transaction was fair and right.

The vice chancellor strongly condemns Miller's conduct in the two suits instituted by Westervelt and De Garmo in the court of chancery.   If a wrong statement was submitted to that court either in the pleadings or proofs, that (although I am apprehensive that it is of frequent occurrence) cannot be justified. But I cannot suppose that such eminent counsel as Mr. Harison and Mr. Munro would be the active, or even the passive instruments of fraud or deception, nor do I believe that it was the habit of the great man who presided in the court of chancery at the time when the transactions took place, to let

matters pass in judgment before him, even by consent, without a thorough examination. My impressions are that he must have inspected the trust deed, and known the object for which the deeds to Westervelt and De Garmo had been executed and the suits thereupon instituted, and that he must have concurred with the counsel in believing that the transaction was honest and fair. Certainly, if he supposed that the children of Mrs. Miller had no legal or equitable interest in the property, and that the only person beneficially interested had assented to the proceeding, he was justified in coming to that conclusion. So far as it related to the rights of the children of Samuel E. Ryerson, they were parties to the suit, and appeared by their father as their guardian. Surely he would not have assented to the perpetration of a fraud, under the forms of the law, by which his children might be deprived of even a remote chance of obtaining a valuable property.

As Mrs. Miller had full power to convey her equitable estate in the premises to third persons, for the purpose of having it eventually transferred to her husband, as she executed conveyances of such estate without coercion or imposition, and acknowledged such execution in the manner required by the statute, and as she was subsequently a voluntary and acting party in suits in which those conveyances were established, she was bound by those transactions, and all her estate legal or equitable in the premises described in the two deeds has passed to the defendant Miller. There is nothing except the testimony of Campbell as to his *first* intention, to show that Miller took the estate designedly as trustee. Nor did Mrs. Miller have any such impression, as is evident from her subsequently taking a mortgage on a part of the same property, to secure the payment of her annuity. That would have been unnecessary, and indeed absurd, if Miller held the property as her trustee, for her separate use. The trust deed provided expressly that when the property should be sold or disposed of, the grantee should hold and enjoy it free from all the trusts therein specified. And the two suits in chancery were instituted for the purpose of discharging the property from such trusts before it was conveyed

to Miller. Miller has, in effect, given a valuable if not a full consideration for these lands as they were conveyed and assigned to him. He amply secured to his wife an annuity of six hundred dollars during her life, and conveyed in trust for her children property valued at 12,900 dollars to be held by them in fee after his decease. I was strongly impressed with the remark made by my brother Barculo, during the argument, that the children would fare better by this arrangement than by that proposed in the original trust deed, even if the provision designed for their benefit in that deed had been unquestionably valid.

But the two suits brought by Westervelt and De Garmo were not conclusive upon the present plaintiffs. They were then infants, and there was no provision in the decree allowing them a day to show cause after they came of age. The cases cited by the vice chancellor are conclusive on this point. If therefore, they have any valid interest by way of remainder or otherwise, in the property in question, they are entitled to the protection of this court.

The circumstances of this case render it necessary to consider and determine what interests were retained, if I may use the expression, for Mrs. Miller, or granted to her children by the trust deed; and those are the questions on which the decision of this case must turn.

The trust deed is not very perspicuous. It was evidently drawn by some one better acquainted with the phraseology of legal instruments than with their import. In such cases the intentions of the parties, if they can be ascertained, essentially aid in the construction of the conveyance. Sometimes such intentions are indicated by the language used; but frequently they must be inferred, if at all, from the circumstances. The deed in this case was executed by a young woman, probably soon expecting to be married, and evidently designing that her property should be at her own disposal, free from the control of any one, and especially of her husband. Her primary object was to secure and protect her own interests. The interests of her children, if she should have any, were but secondary con-

siderations. She had none at the time, and when she had she seems to have felt but little regard for them. It is stated in the bill, and is probably the fact, that they are not even personally known to her, and that seems to have been attributable to her, as she was not prohibited from seeing them. She probably desired that if she should leave any property, it should be enjoyed by them in preference to others. There is no evidence that she felt any disposition to make any sacrifice, or to place herself under any restrictions for their benefit. Neither is there any thing to show that while she wished to exempt her property from the control of her husband, she was at all solicitous to place it under the control, or to subject her enjoyment of it to the absolute directions, of another. She states in her deed that she was desirous to make provision for a suitable and permanent support and maintenance out of her property for herself, during her natural life, free from the control of *any other person or persons*, and to secure the *residue* to such children and heirs as she might have, and if she should not have issue, to the children of her brother, Samuel E. Ryerson. Surely with this disposition, she would not, while endeavoring to avoid the control of *any person*, have intentionally placed herself under the entire direction of some one in the matter of her personal expenses, concerning which ladies are sometimes, if not generally, very tenacious of their rights and power. She intended to devote sufficient to satisfy her own wants to her own use, not only out of the income of the fund, but also out of the *principal*, for she makes no distinction, and that her children, or the children of her brother, should have the *residue* if she should leave any. She designed to prevent any one, and especially her husband, from preventing her absolute enjoyment of her property during her life, or the destination of such of it as she might leave for the benefit of her children, or the children of her brother, after her decease. Accordingly a power is given to the trustee to sell the whole of the property. She authorizes him to " absolutely sell and dispose of, or to lease, all and singular, or any part " of the property, and " to make conveyances of all, or any part or parts " of her said estate ; and she

stipulates to join in the execution of deeds for the "whole or any part or parcel thereof." There is no restriction of the power to sell, either as to quantity or purposes. The trustee could sell the whole of it, should it become necessary or *advisable.* It is not stated who is to be the judge, as to the quantity which it would be advisable to sell, nor is it necessary to decide that question as to the property which was actually sold, as both the trustee and cestui que trust joined in the sale. Then as to the avails of the property which was to be sold, the trustee was authorized to pay out various sums for purposes particularly specified, and he is then directed to "forthwith from time to time, pay over the residue thereof, (the purchase moneys and rents,) for and towards the reasonable support and maintenance of Mrs. Miller, as *she may require* the same, upon her own separate receipt only, and for her own use, free from the control of any husband during her natural life." Here again there is no restriction as to the quantity ; true, it is to be for her reasonable support and maintenance, but that can be of no particular importance, as she has the absolute power of making the requisition. That she might take the whole is evident from the direction which immediately follows, that "*the residue, if any there should be,* after the deductions and payments required, should be put out at interest. The direction for the benefit of her children is, that the trustee shall apply the *residue* of the moneys, rents and proceeds, arising by the sale or sales, lease or leases, occasionally for and towards the bringing up, education and support of such child or children as the cestui que trust might have, in a just and ratable proportion, as might be required, during the life of such child or children. This direction shows what Mrs. Miller intended to give to her children, provided she should not require it for her own use; not certainly any disposition to deprive herself of the power of calling for the whole. The terms of the deed, although the language is somewhat indefinite, are I think sufficient to indicate her intentions, and to clothe her with the requisite power to carry them into effect.

The absolute power of disposal of the property in the cestui

que trust, for her own benefit, conferred upon her the equitable fee simple, absolute and unqualified, and rendered the intended limitation over for the benefit of her children, qualified as it was, null and void. The authorities to that effect are conclusive. (*The Attorney General* v. *Hall, Fitzgib.* 314. 1 *Ves. sen.* 9. *Ide* v. *Ide,* 5 *Tyng,* 500. *Jackson* v. *Bull,* 10 *John.* 19. *Livingston* v. *Delancey,* 13 *Id.* 537. *Jackson* v. *Robbins,* 15 *Id.* 169. *The same case in error,* 16 *Id.* 397.)

The plaintiffs had therefore no valid interests to protect, and their bill cannot be sustained. In my opinion, the decree of the vice chancellor should be reversed, and the bill should be dismissed.

As the controversy has been caused by the doubtful, and to some extent, conflicting provisions of the trust deed, I think that the plaintiffs were justifiable in coming into a court of equity to obtain a judicial construction of that instrument, and that they should not be subjected to the payment of costs.

Decree appealed from, reversed.

